IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | C/A No. 3:10-510-JFA |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DOROTHY LEE ANDERSON d/b/a | ) | |
| DL ANDERSON TAX SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING THE UNITED STATES OF AMERICA'S MOTION FOR
SANCTIONS AGAINST DEFENDANT FOR VIOLATING THIS COURT'S MAY 5, 2010
ORDER AND DENYING DEFENDANT'S MOTION TO DISMISS WITH PREJUDICE /
RES JUDICATA AND MOTION FOR FORTHCOMING BOND**

This action comes before the Court on Defendant Dorothy Lee Anderson d/b/a DL Anderson

Tax Service's motion to dismiss with prejudice / res judicata the contempt proceeding to determine

whether she has complied with this Court's May 5, 2010 Order (ECF No. 65), Anderson's motion

for forthcoming bond to permit her to travel outside the United States (ECF No. 66), and on the

United States' motion for sanctions against Anderson for violating this Court's May 5, 2010 Order

(ECF No. 73). The United States opposed both of Anderson's motions, and Anderson did not

respond to the United States' motion for sanctions. After reviewing these motions, the evidentiary

record, the September 10, 2010 hearing transcript, the deposition testimony Anderson provided on

September 24 and October 15, 2010, and the corresponding deposition exhibits[1], this Court grants

---

[1] The Court received a true and correct copy of the deposition exhibits from the
September 24, 2010 Deposition of Anderson during the October 15, 2010 deposition over which
it presided. These exhibits were numbered exhibits 1 through 17, and the exhibits for the
October 15, 2010 deposition were numbered 1 through 4.

the United States' motion for sanctions against defendant for violating this Court's May 5, 2010 Order, finds that she should be held in contempt for violating such Order, grants the United States' request to impose sanctions against the defendant, and as a result denies both Anderson's motion to dismiss with prejudice / res judicata and her motion for forthcoming bond.

## PROCEDURAL HISTORY AND FINDINGS OF FACT

1.      On March 3, 2010, the United States filed this suit to seek an injunction under Sections 7402(a), 7407, and 7408 of the Internal Revenue Code against Dorothy Lee Anderson ("Anderson") d/b/a DL Anderson Tax Service ("DL Anderson") to restrain and enjoin her from acting as a federal tax return preparer. (ECF No. 1.)  Because Anderson failed to answer, or otherwise respond to, the complaint, the clerk of court entered default on April 21, 2010. (ECF No. 10.)

2.      Thereafter, on April 29, 2010, the United States filed a motion for default judgment and permanent injunction. (ECF No. 12.)  On May 5, 2010 this Court entered judgment and a permanent injunction order against Dorothy Lee Anderson d/b/a DL Anderson Tax Service which the United States served upon her. (ECF Nos. 14 & 16.)

3.      In this May 5, 2010 Order, based upon the well-pled allegations in the complaint, the declarations attached thereto and the other evidentiary materials submitted by the United States in support of its motion for default judgment and permanent injunction, the Court found that, during the 2008 filing season, Anderson electronically filed fraudulent 2007 federal income tax returns claiming tax refunds with the IRS on behalf of a significant number of taxpayers without their authorization or knowledge. (*See, e.g.*, ECF No. 14.)  Anderson signed these returns as a paid preparer and included her Electronic Filing Indicator Number ("EFIN") on the returns and then

2

converted these tax refund checks to personal use by directing them to be deposited into bank accounts she controlled. (*Id.*) The IRS has thus far discovered that erroneous tax refund checks totaling $290,929 were directly deposited into Anderson's bank accounts (or bank accounts she controlled), and she then used at least $223,345 for personal use. (*Id.*)

4.    The Court found that Anderson, by filing the fraudulent tax returns without the taxpayers' knowledge or consent and then appropriating the tax refunds for herself, perpetrated identity theft on taxpayers from whom she had wrongfully obtained social security numbers and other sensitive tax information and had stolen money from the United States Treasury. (*Id.*) As a result of these activities, Anderson undermined confidence in the internal revenue laws of the United States and caused the United States to expend scarce and unrecoverable resources monitoring tax returns she files. (*Id.*) Thus, this Court permanently enjoined Anderson from preparing any federal income tax returns on behalf of others and required her to produce copies of certain customer records and to notify all persons on whose behalf she has filed returns of her illegal activities. (*Id.*)

5.    Specifically, in addition to permanently enjoining Anderson from working as a tax preparer, the Court ordered her to (1) "produce to counsel for the United States within 21 days of the date of this Order a list that identifies by name, social security number, address, e-mail address, and telephone number and tax period(s) all persons for whom she or her employees or agents prepared federal tax returns or claims for refund since January 1, 2007"; and (2) "send by United States mail (at her own expense) a copy of the permanent injunction entered against her in this action to each person for whom she, or anyone at her direction and employ, prepared federal income tax returns or any other federal tax forms after January 1, 2007" and then "provide to the United States a certificate of compliance, signed under penalty of perjury, within 21 days of entry of this order." (ECF No. 14.)

6.    Anderson was required to provide this information to the United States on or before May 26, 2010. (ECF No. 16.)  Furthermore, this Court also ordered Anderson to file a certificate of compliance with both provisions within 28 days of the Court's Order (*i.e.*, on or before June 2, 2010). (*Id.*)  Anderson failed to comply with these provisions. (ECF Nos. 16 & 18.)

7.    As a result, on June 4, 2010, the United States filed a motion for an order to show cause why Anderson should not be held in contempt. (ECF No. 16.)  After continuing one hearing to accommodate Anderson's travel schedule, on July 30, 2010 this Court ordered Anderson to show cause why she should not be held in contempt at a hearing scheduled for September 10, 2010. (ECF Nos. 18 & 25.)  Prior to this hearing, Anderson filed several written responses contending that she could not comply with this Court's May 5, 2010 Order because she did not possess any responsive records, and that these records were in the possession of an individual she referred to as Tameka Davis. (ECF Nos. 17, 30.)

8.    In her September 8, 2010 response, Anderson provided no evidence to substantiate her claim that Tameka Davis ran DL Anderson, that Tameka Davis prepared the tax returns at issue, or that Tameka Davis received the refunds erroneously issued by the IRS. (*See, e.g.,* ECF No. 30.) During her September 24 and October 15, 2010 depositions, Anderson failed to provide any further credible factual evidence supporting her claim.

9.    On September 10, 2010, this Court ordered Anderson to appear for a deposition and "truthfully and completely answer all questions pertaining to this case," including those related to her defense that she could not produce records as required by its Order. (ECF No. 34; *see also* September 10, 2010 Hearing Transcript ("9/10 Hr'g. Tr.") at 19:6-7.)  Because Anderson had previously moved this Court to continue one hearing to accommodate her trip outside the United

4

States and there was reason to believe that she would again attempt to travel outside the United States, this Court also ordered Anderson not to travel outside the United States until further notice from the Court. (ECF No. 38.)  Finally, this Court ordered her to appear for a deposition on September 24, 2010.

10.    While Anderson appeared for her September 24, 2010 deposition, on September 30, 2010, the United States moved this Court to compel her to attend another deposition for violating the September 10, 2010 Order by refusing to answer questions concerning: (i) the identity of the person(s) who assisted her with the drafting of the documents provided to counsel for the United States during her September 24, 2010 deposition, including those persons who permitted her to use a computer; (ii) the finances and general operations of Dorothy Anderson Ministries (sometimes known as DA Ministries), which received over $150,000 in erroneous tax refunds as a result of Anderson's abusive practices; (iii) the locations and occupations of her three children, as well as their involvement with DL Anderson and Dorothy Anderson Ministries, even after being shown two checks signed by Anderson and drawn on the DL Anderson account and payable to two of her children for "preparation fees"; (iv) the "spiritual fathers" who advised her during the course of this proceeding and may have additional information pertaining to the issues raised in this case; and (v) Anderson's gambling winnings which she claimed accounted for the income in her accounts, including where she deposited the money or how she otherwise spent her winnings. (ECF No. 42-1 at 1-3; *see also* ECF No. 44 (September 24, 2010 Deposition Transcript ("9/24 Dep.").)

11.    On October 1, 2010, the Court granted the United States' motion to compel and ordered Anderson to appear for a continued deposition on October 15, 2010. (ECF No. 45.) Specifically, this Court ordered Anderson to "truthfully and completely answer all questions

5

pertaining to this case. She is also requested to bring with her any records, documents, bank statements, and the like requested by the government. Finally, she is ordered to not leave the country until further notice." (*Id.*) This Court also found Anderson in contempt and stated that "[s]anctions will be held in abeyance until the completion of the case." (*Id.*)

12.    With Judge Joseph F. Anderson, Jr., presiding, Dorothy Anderson appeared for the continued deposition and answered the United States' remaining questions. (ECF No. 57 (Transcript of Anderson's October 15, 2010 Deposition ("10/15 Dep.").) Anderson, however, failed to produce any additional documents and provided no additional evidence to substantiate her claim that she could not comply with this Court's May 5, 2010 Order because all of the information and records were in the possession of Tameka Davis.  Anderson also failed to provide Davis' last known address, her telephone number, and any of the names of Davis' children. (*See id.*)

13.    At the conclusion of the October 15, 2010 deposition, this Court requested that the United States file a memorandum of law addressing whether it had the power to restrict Anderson's travel until it could decide whether to sanction her. (ECF No. 57.)  On October 25, 2010, the United States filed the requested memorandum of law. (ECF No. 58.)  On October 26, 2010, the Court ordered Anderson to respond to the United States' memorandum of law and to provide a list of her assets that could be used for bond. (ECF No. 59.)

14.    On November 4, 2010, in response to this Court's October 26, 2010 Order, Anderson moved this Court to allow her to post a bond on the ground that she was not a flight risk. (ECF No. 66.)  Anderson asserted that she owned a home and automobiles that she valued at over $70,000. (*Id.*) Specifically, Anderson disclosed her interest in (i) real property located at 1551 Clarkson Road, Hopkins, South Carolina 29061 (valuing the property at $91,198 with her interest valued at

6

$54,841.62), (ii) a 1994 Ford Explorer (valued at $750.00), (iii) a 2001 Lincoln Custom Coach (valued at $15,000), and (iv) a 1998 BMW V-8 (valued at $1,500 with her interest valued at $250.00). Anderson stated that she "has no intent to leave the country." (ECF No.66 at 2.)

15.    On November 4, 2010, Anderson also moved to dismiss the contempt proceedings, asserting that she had satisfied all of her obligations to this Court. (ECF No. 65.)

16.    On November 10, 2010, this Court provided the United States with the opportunity to respond to Anderson's motions and ordered Anderson "NOT to leave the country until the issue [of her ability to post bond] has been ruled on by the Court." (ECF No. 67 (emphasis in the Order).) On November 22, 2010, the United States opposed Anderson's motions and moved this Court to sanction her for her contemptuous conduct. (ECF Nos. 71 - 73.) Despite being served with such motion, Anderson did not respond to the United States' motion for sanctions and did not file a reply to the United States' responses to her motions.

17.    Based upon the entirety of the record and after presiding over Anderson's October 15, 2010 deposition, this Court finds no factual support for, and does not believe, Anderson's defense that she could not comply with this Court's May 5, 2010 Order. Despite her claim that DL Anderson was Tameka Davis' business, Anderson has provided no explanation for how $179,000 in federal and state tax refunds were deposited into the Dorothy Anderson Ministries account given that she admitted that Tameka Davis was not involved in the ministry when these funds were then converted for Anderson's personal use. Furthermore, Anderson could not explain how her three children received benefits from the erroneous refunds deposited into the DL Anderson account. (*See id.*) Finally, Anderson had no explanation for how Tameka Davis could have operated DL Anderson out of Anderson's house when such house had been destroyed by fire in September 2007, was

7

unoccupied by Anderson and was not replaced until around the time Anderson contends Tameka Davis left with all the records in May or June 2008. (*See id.*)  The evidence presented by the United States establishes that Anderson lost her home to fire in September 2007 and that she continued to negotiate with her insurance company concerning whether she should rebuild and ultimately purchase a new mobile home in either April or May 2008.  During this time, Anderson admitted that she did not live in her house because it had been totally destroyed by fire. (*See* 10/15 Dep. at 30:9.)  As a result, Tameka Davis could not have operated DL Anderson out of this same house during the time period after Anderson's home had been destroyed by fire.

18.    In reaching these findings, this Court finds that Anderson's explanations as being without credible factual support and undermined the below referenced admissions:

•      ". . . I have no knowledge as to the contents of this matter.  Said party [Tameka Davis] is still at large and I have no information and or/address (sic) of this party.  Because, [Tameka Davis] and or/they (sic) took all the records and addresses. My search and inquires (sic) concerning this party have proven to be of no avail. I cannot locate this party in order to respond to this injunction." (ECF No. 17 (July 8, 2010) at 1 (original in all caps).)

•      "During an out of state 5-day Christian reunion and promotion in my absence Ms. [Tameka] Davis and/or party cleared my home of records and files and most of my personal records not pretaining (sic) to this case, leaving me with nothing to work with and nothing to locate her, there was no response on her phone all went dead and came to a dead end without notice." (ECF No.30 (September 9, 2010) at 1 (original in all caps); *see also* ECF No. 30-1 at 2 (Anderson indicated that she met Davis sometime in 2006 at a "Christian Convention for Women.")))

•      ". . . At Ms. Davis request I was to pay her $300.00 per week through my checking account, my bank records will prove my statement to be true." (*Id.*)  During Anderson's deposition, she changed this statement when confronted with the bank records to state that Tameka Davis told her that she would pay herself $300 a week. (9/24 Dep. Tr. at 184-85.)

•      "All records and documentations (sic) was taken by Ms. Tameka Davis because they were her clients and I never knew anything about any of them, who they were and/or how many, all vanished abruptly without notice.  This is defendants (sic) probable cause why she should not be held in contempt." (*Id.* at 2; *see also* 9/24 Dep. at 83 (testified she did not know clients, employees or whether it advertised).)

•    To summarize her position, Anderson stated that "[i]t was well established and stated that Ms. Tameka Davis, operated her business in my name from my home, with my permission, she was a single mother with two children and she had no bank accounts, no credit, and very little or next to nothing in money, and she had no money to pay for a lease or rent a building for her business." (ECF No. 41 at 1.)

•    Anderson stated she "took an on-line course in elementary tax filing for her own benefit to file her own tax documentation, Christian Musical Association, her ministry and casino winnings.  It is impossible to accept and believe that defendant possess the knowlwdge (sic) and have the ability to defraud and/or falsify illegal tax return documentations?  The allegations brought against the defendant are groundless and without merit and <u>fictitious</u>, it is clear the defendant does not have professional psychological skills and/or operate with a criminal mind as she is alleged to be and operate." (*Id.* (emphasis in original and original in all caps).)) During Anderson's deposition, she testified that she took this training class at her house on a computer brought by Davis, even though she could not explain how she took this training class without Internet access at her house. (9/24 Dep. at 64-5.)  Despite her admission to this Court that she applied for an EFIN, Anderson testified that she did not know anything about an EFIN and that this was "Ms. Davis' account." (*Id.* at 55:14-15.)

•    During Anderson's September 24, 2010 deposition, she testified that Davis ran the business in her home's "office area" and that Davis paid her rent in cash but Anderson did not know how much.[2] (9/24 Dep. at 90-92; *see also id.* at 29-30 (ran the business from "a small office area" in Anderson's home).)  Anderson testified that Davis "operated the business from my home." (*Id.* at 14-15.)  In connection with the operation out of her home, Anderson further testified that Davis kept the documents in a small space measuring around 8' x 10' and that Davis kept a locked cabinet in this area. (*Id.* at 93.)

•    Notwithstanding Anderson's claims that she gave Davis unfettered use of her home and EFIN, she did not know, and never presented evidence regarding, Davis' children's names, where she lived or her telephone number, had never been to her house, and had no other information pertaining to Davis. (*Id.* at 62-63.)  The Court rejects this assertion as being unsupported by the factual record.

•    Anderson described the fact (as confirmed by this Court's finding) that she received the tax refunds and converted them to personal use "an untrue statement." (ECF No. 30-1 at 3.)  Anderson claimed that she is "supported by her children, her ministry and her Christian musical promotions.  Also Defendant was awarded a lump sum of money for the mysterious malicious murder of her late husband, where he was shot and killed for reasons unknown?" (*Id.*)

---

[2] During Anderson's deposition she did not "recall" telling Jerry Arrington, the Internal Revenue Service Revenue Agent who investigated Anderson, that she started DL Anderson on the advice of a now-deceased attorney. (9/24 Dep. at 51. *Cf* with ECF No. 1-2 (Arrington Decl.) at ¶ 12.)

Finally, Anderson produced a February 2009 letter from Brookland Federal Credit Union ("Brookland Federal") addressed to Anderson regarding an unidentified account which she claims was DL Anderson's account to assert that its account was "hacked" (*Id.* at 70-71.) During her deposition, Anderson could not explain how she determined that a letter addressed to her, rather than DL Anderson, and referencing an unknown Visa card pertained to the DL Anderson account. (9/24 Dep. at 151-52 & 159-61; *see also* ECF No. 30-6 (February 18, 2009 letter).) This conclusion is further buttressed by the fact that Anderson admitted she lacked any other documents pertaining to the DL Anderson account. (*See id.*) As a result, this Court rejects Anderson's reliance upon this letter.

•      Anderson testified that she had no records to produce, because Davis left one or two months after the April 15th tax filing deadline (*i.e.*, in May or June 2008). (*See id.* at 59:13-60:7 & 200:22-201:23.)

•      Instead of working as a tax preparer, Anderson testified that she is "a licensed, respected, spiritual, devoted evangelical minister in the State of South Carolina, registered with the Secretary of State.[3]" (9/24 Dep. at 26:9-11.)

•      Despite claiming she had nothing to do with DL Anderson, Anderson provided no credible explanation for why her website (www.ifaifa.com) listed one of her roles as the CEO of DL Anderson beginning in November 2007 (the same month the IRS approved her application for an EFIN). (9/24 Dep. at 122-24 & Ex. 15.)

•      In an attempt to deny that she profited from the theft of the money taken from the United States throughout 2008, Anderson testified that she won in excess of $130,000 gambling from March through November 2009. (9/24 Dep. at 39:20-25 & 177:23-178:1; 9/24 Dep. Exs. 7 (including casino winning documents) & 9 (summary of winnings).) Anderson produced no records substantiating any purported winnings from 2008. (9/24 Dep. at 40.) Anderson testified that she "took an online course to learn how to do my own taxes, because of my winnings, again, from the casinos." (*Id.* at 52.) Anderson also claimed to have received life insurance proceeds from the 2001 murder of her then-husband, but she did not recall the settlement amount and possessed no records indicating that any proceeds remained in 2008.[4] (*Id.* at 108.) Anderson further testified that she received the money she used to gamble with from vouchers from the casinos, her children and other family members. (*Id.* at 206-08.) Anderson testified that she used her winnings to fund her ministry and deposited some of the money in her Brookland Federal account, but admitted she did not have

---

[3] As provided for under Fed. R. Evid. 201, this Court takes judicial notice that Dorothy Anderson Ministries was registered with the South Carolina Secretary of State on September 7, 2004. *See* http://www.scsos.com (searching under the corporate name Dorothy Anderson Ministries).

[4] During Anderson's deposition she also admitted that she had no other financial accounts or credit cards. (9/24 Dep. at 188-89 & 192.)

any remaining gambling winnings. (9/24 Dep. at 211-12 & Ex. 12; 10/15 Dep. at 28.)

•       In her deposition, Anderson answered "[o]f course not" when asked whether Dorothy Anderson Ministries had anything to do with providing clients tax services. (9/24 Dep. at 48:9-49:5.) During her October 15, 2010 Deposition, Anderson testified that she did not receive any money from DL Anderson but had no explanation for how over $179,000 in tax refunds was deposited into her Dorothy Anderson Ministries account. (10/15 Dep. at 12-13.)

•       Instead of explaining the inconsistencies and improbabilities of her underlying testimony, Anderson moves to dismiss these contempt proceedings based upon baseless attacks on the character of Attorney Benjamin L. Tompkins as to her ability to file tax returns on behalf of current and former Alabama prisoners and her reasons to leave the United States and travel to Ghana. (ECF No. 41 at 3-5; ECF No. 65 at 2-3.) Because these attacks are baseless and Attorney Tompkins has conducted himself properly, the Court rejects these attacks.

•       Finally, Anderson reiterates her refusal to comply with this Court's May 5, 2010 Order requiring her to mail a copy of the Order to persons she filed tax returns on behalf of. (ECF No. 65 at 3.)  Because these persons have never heard of Anderson, she asserts that this proves her case. (*Id.*)

        19.     In addition, this Court finds that the following admissions by Anderson undercut the

above-rejected explanations:

•       Anderson admitted to opening up a bank account in the name of DL Anderson in February 2008. (9/24 Dep. at 75-76; 9/24 Dep. Ex. 12.[5])  The DL Anderson account was used exclusively by her, she was the only person authorized to write checks and Davis was not authorized to write checks or otherwise withdraw or transfer money from this account. (9/24 Dep. Ex. 12.) Anderson admitted that she signed the checks for DL Anderson. (9/24 Dep. at 131-33.)  Anderson also admitted that DL Anderson had a refund anticipation loan account with Santa Barbara Bank and Trust. (9/24 Dep. at 53-54.)

•       Anderson admitted that she reported earning $9,000 from DL Anderson on her 2008 tax return. (9/24 Dep. at 53.)

•       Anderson also admitted that none of her children were DL Anderson employees or tax preparers. (*Id.* at 47:16-19 & 134-35 (Brittney Anderson and Gwennatra Jackson were not tax preparers).)

_____

        [5] In addition to this account, Anderson admitted that she herself had a personal checking account and a checking account for Dorothy Anderson Ministries. (9/24 Dep. at 73; 9/24 Dep. Ex. 12.)

•    Anderson admitted that she did not report Davis' disappearance with the records to the police. (9/24 Dep. at 146.)

•    With regard to Dorothy Anderson Ministries, Anderson admitted that she was the only employee and that everyone else worked as a volunteer. (*Id.* at 49:6-9.)  Currently, Anderson also works "as a promoter for an outreach ministry" in Ghana which will require her to spend a lot of time there. (*Id.* at 101-02.)  During her October 15, 2010 Deposition, Anderson testified this was her only paying job and that she is not paid by her ministry. (10/15 Dep. at 17-18.)  With regards to her ministry, Anderson testified that it did not receive "substantial" donations and instead received food and clothing which it would distribute to persons in need. (9/24 Dep. at 187-88; 10/15 Dep. at 17.) For her ministry, Anderson testified that there were no bookkeepers or accountants. (10/15 Dep. at 26.)

•    Anderson admitted that she was responsible for writing the checks on the Dorothy Anderson Ministries account and that there was no one else with that authority. (9/24 Dep. at 141; *see also id.* at 166:9-11 (admitted that there were no other employees of the ministry).

## CONCLUSIONS OF LAW

A.    **Standards**

1.    "Civil . . . contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949); *Bradley v. Am. Household, Inc.*, 378 F.3d 373, 378 (4th Cir. 2004) (quoting *Buffington v. Balt. County*, 913 F.2d 113, 133 (4th Cir. 1990)) ("The basic difference between civil and criminal contempt sanctions is that civil contempt sanctions are intended 'to coerce the contemnor into compliance with court orders or to compensate the complainant for losses sustained,' while criminal contempt sanctions are intended 'to vindicate the authority of the court by punishing the contemnor and deterring future litigants' misconduct . . . .'"); *Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 821 (4th Cir. 2004) (quoting *In re General Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995)) (A court may impose sanctions for civil contempt " 'to coerce obedience to a court order or to compensate the complainant for losses sustained as a

12

result of the contumacy.'").

2.     A district court has broad discretion in using its contempt powers to assure compliance with its orders. *See Shillitani v. United States*, 384 U.S. 364, 370 (1966). "Determining if a party has committed civil contempt involves essentially only consideration of whether the party knew about a lawful order and whether he complied with it." *Burd v. Walters (In re Walters)*, 868 F.2d 665, 670 (4th Cir. 1989); *see also United States v. Conces*, 507 F.3d 1028, 1041-42 (6th Cir. 2007). This determination is a two-part inquiry: (1) did the party know of the lawful order of the court, and (2) did the defendant comply with it. *See Burd*, 868 F.2d at 670; *see also Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000) (stating that to establish civil contempt, the movant must establish four elements by clear and convincing evidence: "'(1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) . . . that the decree was in the movant's 'favor'; (3) . . . that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) . . . that [the] movant suffered harm as a result.'") (citation omitted).

3.     The moving party does not have to show that the violation is intentional; contempt occurs whenever a party fails to comply with an order of the court, whether that failure is intentional or not. *McComb*, 336 U.S. at 191; *see also JTH Tax, Inc. v. Lee*, 540 F. Supp. 2d 642, 647 (E.D. Va. 2007) (("The court need not make a finding that defendant's actions were willful in order to find him in contempt of court"); *In re Cherry*, 247 B.R. 176, 187 (Bankr. E.D. Va. 2000) ("In a civil contempt proceeding, the state of mind with which the contemnor violated a court order is irrelevant and therefore good faith, or the absence of intent to violate the order, is no defense."). Because the United States met its burden to show that Anderson has violated the May 5, 2010 Order, Anderson

bears the burden of showing that compliance is impossible, and she is "obliged to make this showing 'categorically and in detail.'" *Conces*, 507 F.3d at 1043; *United States v. Rylander*, 460 U.S. 752, 757 (1983).

4.      Previously, on July 30, 2010, this Court entered a Notice and Order to Show Cause directed to Anderson to explain why she should not be held in contempt. (ECF No. 25.)  The Court entered this show cause order in response to the United States' motion for a show cause order concerning Anderson's failure to comply with the Court's May 5, 2010 Order. *See Reynolds v. Roberts*, 207 F.3d 1288, 1298 (11th Cir. 2000) ("If the plaintiff (the party obtaining the writ) believes that the defendant (the enjoined party) is failing to comply with the decree's mandate, the plaintiff moves the court to issue an order to show cause why the defendant should not be adjudged in civil contempt and sanctioned") (citations omitted).

5.      Specifically, the United States argues that Anderson violated this Court's permanent injunction by (1) failing to "produce to counsel for the United States within 21 days of the date of this Order a list that identifies by name, social security number, address, e-mail address, and telephone number and tax period(s) all persons for whom she or her employees or agents prepared federal tax returns or claims for refund since January 1, 2007"; and (2) failing to "send by United States mail (at her own expense) a copy of the permanent injunction entered against her in this action to each person for whom she, or anyone at her direction and employ, prepared federal income tax returns or any other federal tax forms after January 1, 2007" and then "provide to the United States a certificate of compliance, signed under penalty of perjury, within 21 days of entry of this order." (ECF Nos. 14 & 16.)

        **B.      Anderson failed to establish that her compliance with the May 5, 2010 Order**

14

**is impossible and the United States has established by clear and convincing evidence that she violated the Order**

6. Anderson does not dispute that she failed to comply with this Court's May 5, 2010 Order. Because Anderson does not dispute that she knew of the Court's May 5, 2010 Order and has otherwise failed to comply with it, she must establish that her compliance therewith is impossible. In satisfying her burden, Anderson is "obliged to make this showing 'categorically and in detail.'" *Conces*, 507 F.3d at 1043; *see also Rylander*, 460 U.S. at 757. Anderson has failed to satisfy her burden.

7. Arguing that she complied with the Court's Order, Anderson insists in her motion to dismiss and in her prior papers that (i) she had nothing to do with DL Anderson, (ii) she allowed Davis to establish and then run the business out of Anderson's home, (iii) Davis controlled DL Anderson's bank account and (iv) Davis disappeared with all the books and records like a thief in the night. This Court rejects Anderson's explanations.

8. There is indisputable evidence that Anderson started DL Anderson, naming it after herself, applied for the EFIN, opened DL Anderson's bank account, and then had the erroneous refunds directly deposited into two accounts which she controlled (the DL Anderson and Dorothy Anderson Ministries accounts). Furthermore, it was impossible for Davis to run the business from Anderson's home where fire had previously destroyed it.

9. The factual record establishes that in October 2007 Anderson applied for an EFIN in her own name without mentioning Davis. (ECF No. 1- 2 at ¶ 5 & Ex. 1 (Arrington Decl.); *see also* 9/24 Dep. Ex. 11.) The purpose of this EFIN was to allow Anderson to file tax returns on behalf of other taxpayers. (ECF No. 1-2 at ¶ 5.) Indeed, when questioned by this Court during the September

15

10, 2010 hearing, Anderson admitted that she filed "the application to get this electronic filing number." (Sept. 10, 2010 Tr. at 9:13-17.)    Furthermore, the IRS received 451 tax returns electronically filed using Anderson's EFIN number. (ECF No. 14 at ¶¶ 5-6; ECF No. 1-2 (Arr. Decl. at ¶ 6 & Exs. 2-3).)

10.    Anderson's belated claims that she did not apply for an EFIN, and that she only took an online tax preparation class to be able to electronically file a tax return reporting her casino winnings, are preposterous. (9/24 Dep. at 55 & 64-65.)  Anderson applied for the EFIN in October 2007, but did not receive her casino winnings until 2009, and provided no other evidence that she received casino winnings in excess of $229,000 in 2008. (*Cf.* ECF No. 14 at ¶ 5 with 9/24 Dep. Exs. 7 & 9.)  Furthermore, as declared by Jerry Arrington, an EFIN allows a preparer to file tax returns on behalf of taxpayers (and is unnecessary to file a person's own individual return). (ECF No. 1-2 at ¶ 5.)

11.    Anderson has presented no evidence that DL Anderson was Davis' business or that Davis "operated the business from [Anderson's] home." (9/24 Dep. at 14-15; *see also id.* at 82:18-22 (Anderson has put forth no evidence which corroborates her claim that Davis exists).).  Anderson opened up a bank account for DL Anderson, was the only person authorized to sign checks for this business, and was the only person whose signature appears on checks introduced by the United States. (9/24 Dep. at 131-33; 9/24 Dep. Exs. 12 & 16.)  When confronted with these checks, Anderson admitted that the signatures on those checks appeared to be her signature and that she did not see any checks signed by Davis. (*Id.*)  Anderson also conceded that Davis lacked check-writing authority, and she made no effort to explain why DL Anderson's bank account continued to receive tax refunds up until November 2008 even though Davis allegedly disappeared in May or June 2008.

16

(*Id.; see also* ECF No. 73-1 ( summaries of bank statements contained in 9/24 Dep. Ex. 12).[6])

12.    Further undermining Anderson's story are two checks written to her daughters – one check to Gwennatra D. Jackson for $1,500 on March 14, 2008 with "preparation fees" written in the memo line and another check to Brittney Anderson for $1,000 on March 14, 2008 also with "preparation fees." (9/24 Dep. at 16.)  Anderson thus paid her daughters for "preparation" services even though her daughters were not tax preparers, and this was purportedly not her business. (*Id.*) Anderson then wrote two more checks to Gwennatra D. Jackson and Brittney Anderson with "Tax Refund" in the memo line – one for $3,117 and dated April 12, 2008 (to Brittney Anderson) and the other for $2,500 and dated March 28, 2008 (to Gwennatra D. Jackson). (9/24 Dep. Ex. 12.) Anderson also wrote a check dated March 31, 2008 to the "SC Department of Revenue" for $1,142.00 to cover the tax liabilities for Lewis A. Anderson, her son. (*See id.*)  Anderson also wrote a check, dated March 31, 2008, to Rapheal Osuji for $5,000 with "investment" in the memo line. Anderson signed these DL Anderson checks even though she claims it was not her business. (*See id.*)  The bank records also do not support her assertion that she paid $300.00 per week to Davis to run this business, and Anderson could not explain this contradiction. (*See, e.g.*, 9/24 Dep. Ex. 12; 9/24 Dep. at 130 & 185-86 (Anderson attempted to change this statement by asserting that Davis told her she would pay herself $300.00 per week, directly contradicting her filing with this Court).)

13.    The bank records directly contradict Anderson's testimony that she did not personally benefit from the erroneous federal (or state) tax refunds her EFIN generated.  In fact, these records

_____

[6] In accordance with Fed. R. Evid. 1006, the United States attached as Government Exhibit 1 to its motion for sanctions (ECF No. 73) summaries of the voluminous records - namely the accounts for DL Anderson, Dorothy Anderson Ministries and her own personal account, which were previously marked as Exhibit 12 during the September 24, 2010 deposition. Anderson failed to challenge any of these summaries or the underlying documents.

establish that over $153,000 in federal and state tax refunds were directly deposited into the DL

Anderson Tax account and over $179,000 was deposited into the Dorothy Anderson Ministry

Account. (ECF No. 73 - Gov. Ex. 1 (summaries of bank statements contained in 9/24 Dep. Ex. 12);

9/24 Dep. Ex. 12.)   The United States' summary illustrates that the following amounts were

deposited into the Dorothy Anderson Ministry Account (ACC # 2213-71):

| | |
|---|---|
| TOTAL US TREASURY 220/TAX REFUNDS(98): | $142,669.97 |
| TOTAL TCS TREAS 449/TAX REFUNDS(4): | $ 11,832.96 |
| TOTAL TAX Refund Pro/RALDEPTS(6): | $  7,467.52 |
| TOTAL TAX REFUND PER/RALDEPTS(2): | $  2,498.25 |
| TOTAL MS TAX COMMISS/TAX REFUNDS(4): | $ 14,575.00 |
| **TOTAL TAX REFUNDS FOR ACCOUNT:** | **$179,043.70**[7] |

Upon receiving these funds, Anderson converted most of these funds to personal use[8] and paid for

items including the purchase of her new manufactured home, the payment of student loans, payments

to her children, payments for a car, and transfers to fund her personal expenses. (9/24 Dep. Ex. 12.)

Anderson admitted that Davis had nothing to do with her ministry and lacked access to her ministry's

---

[7] DL Anderson's bank statements reflect the following deposits:

| | |
|---|---|
| ACC # 2574-71 (DL Anderson Tax Service Account) | |
| TOTAL US TREASURY 220/TAX REFUNDS(87): | $133,437.02 |
| TOTAL TCS TREAS 449/TAX REFUNDS(4): | $  3,999.16 |
| TOTAL MS TAX COMMISS/TAX REFUNDS(7): | $ 16,065.00 |
| **TOTAL TAX REFUNDS FOR ACCOUNT:** | **$153,501.18** |

The bank records reveal that Anderson provided Brookland Federal an invalid social security number. (9/24 Dep. Ex. 12 (Decl. of Bruce E. Wright) at ¶ 4.)  Again, Anderson blamed Davis. (9/24 Dep. at 81-82.)  Furthermore, in failing to respond to the United States' motion, Anderson fails to rebut these facts.

[8] The bank records establish that Anderson either paid for items directly from the DL Anderson or Dorothy Anderson Ministry accounts or transferred funds into her personal account. (9/24 Dep. Ex. 12.)

18

bank account. (9/24 Dep. at 141-42 & 10/15 Dep. at 10.) Anderson, however, could not explain how this money was deposited into her account or why she would have spent money that was not hers. (*Id.* at 86-88.)

14.     Anderson's additional attempts to rebut the United States' arguments for how she received the money all fall apart upon examination.  Anderson asserts that the money resulted from her gambling winnings.  However, Anderson's own evidence discloses that any winnings she received occurred in 2009, instead of between March and November of 2008. (9/24 Dep. Ex. 7 & 9.)  Furthermore, despite Anderson's testimony, there is no evidence that she received any of this money from her children or as a result of her late husband's death in 2001.  Indeed, any such explanation is futile when the bank records contain codes for tax refund deposits and for refund anticipation loans, which are not "donations" or "gambling winnings." (9/24 Dep. Ex. 12.)

15.     Davis could not have operated the business out of Anderson's home at a time when it had been completely destroyed by fire.[9] (10/15 Dep. at 22 & 30; 10/15 Dep. Exs. 1-4.)   In September 2007, Anderson's manufactured home was destroyed by fire. (10/15 Dep. at 22; *see also* 10/15 Dep. Ex. 1 (October 2007 letter signed by Anderson acknowledging this loss).)   While Anderson did not remember the exact year of the fire, Anderson admitted that "everything was destroyed from [the fire]." (10/15 Dep. at 30:9.)   Anderson also admitted that she could not live in the house after the fire and that it was not repaired immediately (and was actually not repaired at all).

_____

[9] Furthermore, while Anderson claims that she did not have a computer, someone did file 451 tax refunds electronically, which requires a computer. (ECF No. 14.)  Anderson's own testimony is contradicted by a September 2008 letter produced by her mortgage company to the IRS that indicates it is written by Anderson at a time when she asserts she lacked access to a computer. (9/24 Dep. Ex. 14.)  During this litigation, Anderson has filed various pleadings produced from a computer which she contends she drafted at the public library with assistance from library employees or volunteers. (9/24 Dep. at 14-16.)

19

(*Id.* at 31.)  On February 28, 2008, Anderson signed an estimate indicating that it would take $144,071.05 to fix her home. (10/15 Dep. Ex. 3.)  As a result of learning of this estimated cost, Anderson purchased a new manufactured home using the insurance proceeds and a portion of the erroneous tax refunds during the late spring or early summer of 2008. (10/15 Dep. Ex. 4; 9/24 Dep. Ex. 12.)

      16.      When confronted with these documents, Anderson had no explanation for how Davis could operate a business out of her home at a time when it was destroyed by fire and basically admitted that no one could operate a business during this time:

> Q:     But from the date you returned until the date you got your new home, you
>          weren't living in the property?
> A:     No.
>
> Q:     And was anyone else living at the property?
> A:     Not to my knowledge.
>
> Q:     Was anyone conducting business at the property?
> A:     I'm not sure. Not to my knowledge.
>
> Q:     Was there a way to conduct business at the property?
> A:     What do you mean by that?
>
> Q:     Was there a room available to conduct business in the house?
> A:     The house was destroyed by fire. So I'm not sure what you're asking me.

(10/15 Dep. at 35:10-22.)  As a result, based upon the factual findings and Anderson's failure to respond to the United States' motion for sanctions, this Court rejects her contention that Davis ran DL Anderson out-of-her-home beginning in late 2007 until May or June 2008.

      17.      In her motion to dismiss, Anderson contends she will not send a copy of this Court's Order to anyone, including the six persons whose declarations the United States submitted in support of its motion for preliminary injunction. (*Cf.* 9/24 Dep. at 143-45 & 9/24 Dep. Ex. 17 (Declarations

from Thomas Smart, Stephen Moore, Keith Hicks, Sandy Devon Adams, James Adam Henderson, and Michael Anglin) with ECF No. 65 at 3.)

18.     Because Anderson has the names and addresses for at least six of her victims, she has no excuse for not mailing a copy of the Court's Order to these persons. Moreover, given Anderson's false testimony to-date about the workings of DL Anderson, the Court concludes that it must coerce her compliance with its prior orders so that the United States can either obtain records concerning the identifications of her clients / victims or find out who has those records with the potential to replicate this fraud.

**C.     Anderson will be fined $500 daily**

19.     As a result of the above referenced factual findings, Anderson's failure to produce a customer list, her refusal to mail a copy of this Court's May 5, 2010 Order to her victims, and her failure to certify compliance with this Court's May 5, 2010 Order, this Court will impose the appropriate sanctions requested by the United States. Because Anderson has yet to comply in the four months since this Court entered its amended Order to Show Cause on July 30, 2010 and she was previously held in contempt by this Court on October 1, 2010 (ECF No. 45), this Court concludes that providing her with additional time to avoid sanctions is unwarranted.

20.     Once a court determines that a defendant has not complied with the court's order, the court may impose both coercive and compensatory sanctions. *United States v. United Mine Workers of America*, 330 U.S. 258, 303-04 (1947); *Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543, 557 (6th Cir. 2006) ("The district court has inherent authority to fashion the remedy for contumacious conduct."); *United States v. Work Wear Corp.*, 602 F.2d 110, 115 (6th Cir. 1979) ("Civil contempt is meant to be remedial and to benefit the complainant either by coercing the defendant to comply

with the Court's order via a conditional fine or sentence or by compensating the complainant for any injury caused by the defendant's disobedience.").  When devising sanctions to ensure compliance with its order, the court should consider "the character and magnitude of the harm threatened by continued contumacy and the probable effectiveness of any suggested sanction in bringing about the result desired." *United Mine Workers*, 330 U.S. at 304.

21.     Upon a finding of contempt, the court may enter sanctions in the form of a fine, which can either be compensatory or coercive. *United Mine Workers*, 330 U.S. at 303-04 (1947); *JTH Tax, Inc. V. Lee*, 540 F. Supp. 2d 642, 647 (E.D. Va. 2007).  The court has broad discretion to fashion an appropriate remedy to coerce compliance with the terms of the permanent injunction. *United States v. Darwin Constr. Co.*, 873 F.2d 750, 756 (4th Cir. 1989).  As a result, this Court will fine Anderson $500.00 per day starting on February 2, 2011 until she complies or until the hearing, which will be held on February 9, 2011 at 3 P.M.[10] *Landman v. Royster*, 354 F. Supp. 1292, 1301 (E.D. Va. 1973) (a fine is appropriate to "impress upon the defendants the need to take all steps necessary to carry out all facets of the Court's order").

22.     Imposing this fine furthers the purpose of impressing upon Anderson the need to comply with this Court's Order.  The May 5, 2010 Order requires Anderson to perform identifiable acts which she has not performed, namely, providing the United States with a customer list and mailing a copy of this Court's Order to her purported customers and then certifying to the United States and the Court that this has been done.  Furthermore, giving Anderson five days provides her an incentive to comply without avoiding further fines in excess of $2,500.00.  The United States continues to suffer harm by the fact that it previously paid over $223,000 in erroneous refunds and

---

[10]The Court is in a protracted murder trial beginning January 24, 2011.

22

must be provided the necessary records to prevent Anderson (or others assisting her) from continuing to engage in or replicate this fraud. Imposing monetary sanctions furthers this goal.

**D.     The Court will incarcerate Anderson if she has not complied by the hearing**

23.     If daily fines do not coerce Anderson to comply, this Court should incarcerate her as a coercive sanction for her contemptuous action beginning on February 9, 2011. Incarceration is a valid civil contempt remedy once a party has been found in contempt with a prior court order. *See Bagwell*, 512 U.S. at 840-41 (discussing incarceration on a finding of civil contempt "if the order requires performance of an identifiable act"); *Conces*, 507 F.3d at 1041-44. If daily fines for a period of five days do not coerce Anderson's compliance, then incarceration is an appropriate civil contempt remedy.

24.     Anderson should remain incarcerated until she produces a customer list to counsel for the United States; thereafter, her continued release should be predicated upon her mailing a copy of this Court's order to her purported customers and then certifying to the United States and the Court that this has been done, thus complying with the Court's Order. If Anderson continues to insist that she lacks any records to produce, she must truthfully explain how compliance is impossible. As part of such a truthful explanation, the Court anticipates that Anderson must explain where and how she received the identities of these Alabama prisoners, identify anyone who helped her, explain how she spent the money (along with stating whether any money is left), and identify where it can be located. Only after satisfying this Court of her compliance will Anderson be purged of contempt.

**E.     Anderson's Request for Bond is Denied**

25.     As detailed in the United States' October 25, 2010 memorandum, there is no statute

or rule that expressly authorizes a court to restrict travel or require the posting of a bond to secure the payment of sanctions for being in contempt of court. (ECF No. 58.) Nonetheless, it follows that this Court's power to sanction contempt, including the power to fine and imprison, implies the ancillary power to restrict travel or condition the right of travel to take reasonable measures to ensure that Anderson returns from her foreign travel. While an order to surrender a passport is "very rare" in civil cases outside the matrimonial context, courts have ordered litigants found to be in contempt to surrender their passport. *Merrill Lynch Bus. Fin. Servs., Inc. v. Kupperman*, No. 06-4802, 2007 WL 2300737, at *1 (D.N.J. Aug. 7, 2007).

26.    The Seventh Circuit recognized, and as further detailed above, the district court does "have the power to imprison a recalcitrant litigant for contempt, implying the lesser power to set conditions on freedom." *Herbstein v. Bruetman*, 241 F.3d 586, 589 (7th Cir. 2001) (affirming a District Court's withholding of a passport). Such an order is appropriate where defendant "has 'demonstrated a propensity to leave the country when the heat is turned up.'" *Kupperman*, No. 06-4802, 2007 WL 2300737, at *2 (quoting *Herbstein*, 241 F.3d at 588).

27.    Here, there is every reason to believe that Anderson would not return to the United States even if she were required to post a bond. Furthermore, the requirement that Anderson post a bond is unnecessary since this Court has determined that she is to be held in contempt of court for violating this Court's May 5, 2010 Order, and will be subject to daily fines of $500 for 5 days and then must appear for a hearing in order to determine whether she should be immediately incarcerated.

28.    Even if this Court would allow Anderson to post a bond, her assets simply do not appear to be sufficient to ensure that she would return to the United States. According to her motion

for bond, Anderson's assets are worth only approximately $70,000, and she is only willing to post her house as a bond. (ECF Nos. 66 & 66-1.) Previously, in this Court's May 5, 2010 Order, this Court found that Anderson filed 451 federal tax returns that generated over $223,000 that was deposited into two accounts which she controlled. (ECF No. 14.)  Because Anderson testified that her only paying job is in Ghana and that her husband lives in Ghana (ECF No. 57 at 17-19 (Oct. 15 Dep. Tr.)) and because she purportedly does not have a significant amount of assets vis-a-vis the more than $223,000 that she stole from the United States, there exists a realistic possibility that Anderson may not return from another international trip.

29.    Moreover, based upon the factual findings herein and Anderson's failure to respond to the United States' motion for sanctions, restricting her travel is, and was, necessary to ensure her appearance at a future hearing where other coercive sanctions may be imposed.  While requiring that Anderson post a bond theoretically helps further the goal of coercing a party to comply with present and future court orders, Anderson's proposed bond does not appear to be a large enough to provide a sufficient incentive for her to return, especially when this Court has granted the United States' motion.

30.    In order to minimize any prejudice incurred by Anderson by these travel restrictions, this Court will schedule a hearing for February 9, 2011 so that Anderson can appear to pay her daily fines and either comply with this Court's May 5, 2010 Order or face immediate imprisonment.  As a result of these forthcoming actions, there will be no delay (other than a delay caused by Anderson's refusal to comply) and, therefore, it is unnecessary to provide Anderson with the opportunity to post a bond.  This Court, however, based upon the authorities cited above will keep in place the travel ban to ensure that Anderson appears for the scheduled hearing and provide an incentive for her to

comply with this Court's May 5, 2010 Order.[11] *Cf. Herbstein*, 241 F.3d at 588-89; *Kupperman*, 2007 WL 2300737, at * 2.

31.     Finally, this Court denies Anderson's motion, because the United States will suffer a much greater prejudice from a prolonged delay than Anderson will from a short restriction on her international travel.  As required under this Court's May 5, 2010 Order, the government seeks Anderson's records so that it can ensure that she or other tax preparers do not attempt to engage in similar behavior during the upcoming 2011 or another filing season.  Because Anderson has had almost four months since the Court issued its amended July 30, 2010 order to show cause, this Court should not allow her to travel internationally until she has complied with this Court's May 5, 2010 Order.

### ORDER

Based on the foregoing factual findings, conclusions of law and the case record, the Court orders the following:

**IT IS HEREBY ORDERED** that because the United States has established by clear and convincing evidence that there was a valid decree that Anderson had knowledge of, that such decree was in favor of the United States, that Anderson knowingly violated the terms of the decree, and that

---

[11] Previously, this Court kept in place the travel restriction to permit Anderson sufficient time to respond to the United States' motion for sanctions without unduly prolonging the restriction on her international travel.  As a result, this prevented a further delay of this proceeding and prejudice to the United States which would result from further delays to this proceeding resulting from her international travel.  Specifically, Anderson's original visa obtained in July 2010 only allowed her three months (*i.e.*, until October 2010) to travel to Ghana (ECF No. 24-1 at 4), and she admitted during her deposition that she does not have a current trip scheduled. (ECF No. 57 at 17-19.)  As a result, permitting Anderson to travel before deciding whether to sanction Anderson would have further delayed this proceeding to allow her to schedule a new trip and obtain another visa.

the United States has suffered harm as a result, Anderson will be held in civil contempt for violating this Court's May 5, 2010 Order.  As a result of this Court's finding and after Anderson failed to respond to the United States' motion for sanctions, the United States of America's motion for sanctions against defendant for violating this Court's May 5, 2010 Order is **GRANTED** (ECF No. 73); and it is further

ORDERED that Anderson's Motion to Dismiss with prejudice / res judicata is **DENIED** (ECF No. 65); and it is further

ORDERED that Anderson's Motion for Bond is **DENIED** (ECF No. 66);

The Court **DIRECTS** the United States to serve a copy of this Court's Order upon Anderson in accordance with Fed. R .Civ. P. 4 and file a certificate of service with the Court; and it is further

ORDERED that this Court will impose the following sanctions upon Anderson for her contemptuous conduct:

(a)     Beginning on February 2, 2011, Anderson will begin to incur a daily fine of $500.00 which she must pay at the scheduled hearing unless she can demonstrate that she has complied with this Court's May 5, 2010 Order;

(b)     Thereafter, following daily fines until the scheduled hearing, **IT IS FURTHER ORDERED THAT** Anderson must appear, on February 9, 2011 at 3 P.M. in Courtroom IV at the United States Courthouse, Matthew J. Perry, Jr. Courthouse, 901 Richland Street, Columbia, South Carolina 29201 to demonstrate to this Court that she has complied with this Court's May 5, 2010 Order and to pay her fine.  In order to comply, Anderson must produce the required documents and mail a copy of the Court's Order to her purported customers.  Alternatively, in order to establish that compliance is impossible, Anderson must do so in a credible manner without pointing the finger at

27

Davis.  Anderson must describe the records she possessed in the past, disclose who currently possesses them now, describe what happened to the records, and identify anyone with knowledge of these records, as well as accounting for the proceeds of the erroneous refunds that were sent to accounts controlled by her.  This would include Anderson providing a customer list to counsel for the United States and certifying that she mailed a copy of this Court's Order to all persons for whom she filed federal tax returns and other federal tax forms after January 1, 2007; and

(c)     If Anderson fails to establish at this scheduled hearing that she has complied with this Court's May 5, 2010 Order, then this Court will incarcerate her until such time that she has complied with this Court's May 5, 2010 Order.

IT IS SO ORDERED.

January 21, 2011
Columbia, South Carolina

Joseph F. Anderson, Jr.
United States District Judge

28